UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

```
SANDY J. BATTISTA,              )
     Plaintiff,                 )
                                )
vs.                             )
                                )   CIVIL ACTION
ROBERT MURPHY, Superintendent;  )   NO.
KATHLEEN M. DENNEHY, Commissioner, and
COMMONWEALTH OF MASSACHUSETTS   )   04-10226 MEL
     Defendant's.               )
```

FILED
IN CLERKS OFFICE

2004 JAN 30 P 12:11

U.S. DISTRICT COURT
DISTRICT OF MASS.

## VERIFIED COMPLAINT

Plaintiff, Sandy J. Battista, a involuntarily civilly committed resident at the Mass. Treatment Center, committed under G.L. Ch.123A, §14(d), as amended, states:

INTRODUCTION:

This is a Civil Rights Action for damages and injunctive relief under 42 U.S.C. §1983, seeking enforcement of the "terms and conditions" of the "Management Plan for the Administration and Management of the Mass. Treatment Center for Sexually Dangerous Persons." See King vs. Greenblatt, 53 F.Supp.2d 117, 137 (D.Mass. 1999)("Civilly committed patients may bring an action seeking enforcement of the terms and conditions of the existing Management Plan").

The plaintiff further alleges that, defendant's allowing residents currently civilly committed under the pre-1990 versions of G.L. Ch.123A the privilege to retain in their possession certain personal luxuries at their own expense, while not allowing those residents, like the plaintiff, currently civilly

committed under the amended 1999 version of G.L. Ch.123A the same privilege, violates both the "terms and conditions" of existing "Management Plan," and the equal protection clauses to the State and Federal Constitutions.

The plaintiff lastly seeks relief under 28 U.S.C. §§-2201-02 that, with the re-enactment of G.L. Ch.123A, as appearing in St.1999, c.74, a "significant change in the law" under <u>Rufo vs. Inmates of Suffolk County Jail</u>, 502 U.S. 367, 384 (1992), warrants a review of the constitutionality of St.1993, c.489, and a re-evaluation of the defendant's ability to operate the Treatment Center in harmony with the "terms and conditions" of the Management Plan, based upon numerous Complaints to the contrary.

## JURISDICTION:

This Court has jurisdiction over the subject matter of the enclosed Complaint under 28 U.S.C. §§§1331-32 and 1343.

This Court has supplemental jurisdiction over the plaintiff's state law claims under 28 U.S.C. §1367.

This Court retains jurisdiction over plaintiff's request for enforcement of the "terms and conditions" of the Treatment Center's existing "Management Plan," because the Plan was put in place to remedy alleged wrongs. <u>King,</u> 53 F.Supp.2d at 137.

## PARTIES:

1) The plaintiff, Sandy J. Battista("Battista"), is and was at all times relevant to this Complaint a citizen of the United States and of the Commonwealth of Massachusetts. In-

voluntarily civilly committed, under G.L. Ch.123A, §14(d), as amended. Committed to the Mass. Treatment Center, located at 30 Administration Rd., Bridgewater, Mass. 02324. The plaintiff sues in her own behalf.

2) The defendant, Robert Murphy("Murphy"), is and was at all times relevant to this Complaint the Superintendent of the Mass. Treatment Center. Upon information and belief, defendant Murphy is legally responsible for the day-to-day operations and management of the Mass. Treatment Center, and to ensure compliance with all the "terms and conditions" of the existing 'Management Plan.'" Defendant Murphy has acted under "color of state law" at all times relevant to this Complaint, and is sued in his individual and official capacities.

3) The defendant, Kathleen M. Dennehy("Dennehy"), is and was at all times relevant to this Complaint the Acting Commissioner of the Mass. Department of Corrections. Upon information and belief, defendant Dennehy is legally responsible for the "care, custody, treatment, and rehabilitation" of all those resident civilly committed to the Treatment Center under G.L. Ch.123A, including the plaintiff. Upon further information and belief, defendant Dennehy is also legally responsible for over-sight of the "terms and conditions" of the Treatment Center's existing "Management Plan," and is charged with the authority to promulgate "rules, regulations, policies, and procedures" for all adult correctional facilities in the Commonwealth of Massachusetts, including the Treatment Center. Defendant Murphy has acted under "color of state law" at all

times relevant to this Complaint, and is sued in her official capacity.

4) The defendant, Commonwealth of Massachusetts("Commonwealth"), is and was at all times relevant to this Complaint the entity legally responsible for the enactment of St.1993, c.489, and St.1999, c.74, the subject of the enclosed Complaint. Defendant Commonwealth has acted under "color of state law" at all times relevant to this Complaint, and is sued in it's official capacity.

RELEVANT FACTS:

5) In 1974, this Court entered two "Consent Decrees" in response to Complaints filed by residents at the Mass. Treatment Center("MTC"). See King vs. Greenblatt, et al., U.S.Dist. Ct.C.A.No.72-788-ADM; Williams, et al. vs. Lesiak, et al., U.S. Dist.Ct.C.A.No.72-571-ADM. (Both actions on file).

6) These "Consent Decrees" mandated, among other things, the dual management of the Department of Correction("DOC") and the Department of Mental Health("DMH") sharing the responsibility for the facility, and that civilly committed residents were entitled to "the least restrictive conditions of confinement necessary to achieve the purpose of commitment."

7) In 1986, a new state-of-the-art Treatment Center building was placed into operation, having been constructed to meet the requirements of the "Consent Decree" in the case of Williams, et al. vs. Lesiak, et al..

8) Also in early of 1986, defendant Commonwealth filed legislative bills seeking, among other things, to transfer

control of the Mass. Treatment Center("MTC") from the DMH to the DOC.

9) In 1988, the Legislature authorized a review of G.L. Ch.123A and the MTC. Following a review panel's recommendation, new civil commitments to the MTC were abolished in 1990. See St.1990, c.150, §304(repealing G.L. Ch.123A, §§3-7).

10) In 1994, upon continuing urging of the executive branch, defendant Commonwealth, the legislature finally enacted a statute that purports, among other things, to transfer exclusive control of the MTC to the Commissioner of Corrections, defendant Dennehy. See St.1993, c.489, §2(amending G.L. Ch.123A, §2).

11) Also in 1994, the respondent's in King and Lesiak filed a Motion to Vacate or, in the Alternative, to Modify the Consent Decrees by substituting the DOC for the DMH as the agency designated to have sole responsibility and control for the MTC. King vs. Greenblatt ("King I"), 52 F.3d 1, 3 (1st Cir.), cert denied, 116 S.Ct. 175 (1995).

12) The respondent's Motion was filed pursuant to Fed.-R.Civ.P. 60(b)(5), and was predicated entirely on the enactment of St.1993, c.489.

13) On May 27, 1994, this Court held an evidentiary hearing on the respondent's motion. During the hearing, the Court questioned the DOC's confidence in its ability to deliver treatment, patient treatment, and invited the DOC to provide specific details in the form of a plan on how it proposed to operate the facility. King, 53 F.Supp.2d at 121-22.

The Motion was subsequently denied, and the respondent's appealed.

14) To demonstrate to this Court how it could successfully operate the facility if given sole responsibility for it, the DOC developed an extensive Management Plan for the Administration and Management of the MTC. Id.

15) The "Management Plan," dated September 26, 1994 ("94 Plan"), encompassed in detail almost every aspect of life at the MTC including policies, regulations, rules governing staff, clinical treatment, educational and vocational treatment, a community access program 1/, behavior management, and resident operations.

16) On April 6, 1995, the First Circuit Court of Appeals reversed the district court's ruling and found that St.1993, c.489 was a "significant change in the law" under Rufo warranting modification of the Consent Decrees.

17) On October 31, 1996, this Court's allowed the DOC's Motion to Modify the Consent Decrees. However, directed the DOC to submit an Amended Plan. King, 53 F.Supp.2d at 122.

18) An Amended Plan, dated November 26, 1996 ("96 Plan") was filed with this Court on December 2, 1996. It is this Plan that has been, and continues to be, the basic blue print for the MTC's administration and operation. Id.

19) On June 21, 1999, this Court terminated, rather than vacated, the Consent Decrees based upon the 96 Plan, the DOC's implementation of that Plan, and the agency's alleged commitment to delivering effective treatment to resident's at the

Case 1:04-cv-10226-MEL   Document 2   Filed 01/30/2004   Page 7 of 20

-7-

MTC. Id. at 139.

20) In 1999, the Legislature re-enacted statute allowing for the commitment of "Sexually Dangerous Persons." ("SDP"). See St.1999, c.74, §§3-8, as appearing in G.L. Ch. 123A, §§1, 12-16, as amended. Section 16 provides in part that:

> The treatment center shall submit on or before December 12, 1999 its plan for the administration and management of the treatment center to the clerk of the house of representatives and the clerk of the senate, who shall forward same to the house and senate committees on ways and means and to the joint committee on criminal justice. The treatment center shall promptly notify said committee of any modifications of said plan.

Id. A copy of this Plan is attached hereto for this Court's convenience and marked as Exhibit-1. (Hereinafter "99 Plan").

21) Since the implementations of the 94 Plan, 96 Plan, and the 99 Plan, the defendant's have on numerous occasions arbitrarily ignored the "terms and conditions" of these Plans when it suits their agenda. And in turn, has drastically changed the plaintiff's current civil confinement to that which more "mirrors" those conditions designed to punish in a "penal" facility.

22) The "Treatment Center" consists of eighth housing units: A1-A2, B1-B2, C1-C2, and D1-D2. Units A1, B1, C1, and D1 each have twenty-four rooms, while units A2, B2, C2, and D2 have thirty rooms. All rooms have a sink, toilet, desk, and either wardrobes or footlockers. Originally, unit D2 was double-bunked designated to house state prisoners attending Phase-IV of the DOC's treatment program. Currently, units

D1 and D2 are both double-bunked, and were subsequently designated to house only civil pre-trial detainees awaiting civil commitment proceedings under the 1999 version of G.L. Ch.123A. Though due to over-crowding at the MTC, defendant's have arbitrarily instituted a practice of "forced 'double bunking'" of sexually dangerous persons. See, e.g., <u>Michael Cote, et al. vs. Robert Murphy, et al.</u>, U.S.Dist.Ct.C.A.No. 03-CV-10716-DPW.

23) The "Treatment Center" additionally houses three populations: a modular unit housing approximately 300 state inmates serving prison terms, with the main facility housing residents civilly committed both under the pre-1990 versions of G.L. Ch.123A, as well as those civilly committed and awaiting commitment proceedings under the 1999 version of G.L. Ch.123A.

24) The "Treatment Center" was originally designed only to house and accommodate approximately 216 residents. Yet the defendant's have failed to expand certain areas of the facility to accommodate the increased population. Which will be discussed in more detail, infra.

**(Claims for Enforcement of the "Terms and Conditions" of the 94 Plan, 96 Plan, and 99 Plan):**

25) The plaintiff is currently civilly committed under the current amended version of G.L. Ch.123A, housed in unit B1. Unit B1 also houses approximately 22 residents civilly committed under the pre-1990 versions of G.L. Ch.123A.

26) Under the "terms and conditions" of the 96 Plan, no "double-bunking" at that juncture was contemplated for civilly

committed residents. Though, "if this option were to become desirable at some time in the future, the DOC will follow the protocols described in the original plan." See 96 Plan at page 46 "B. Management of an Expanded Treatment Center Population," attached as Exhibit-2. (Due to the MTC's policy of not allowing whole copies of this Plan, only those pages referred to will be attached).

27) According to the protocols in the original plan, the DOC plans a "two-phase system" to relieve over-crowding. See 94 Plan at page 135 "C. Housing and Double Bunking Plan," Exhibit-3.

28) "Phase-I" consists of the DOC reassigning all those residents still currently serving prison terms to other facilities to make available as many beds possible to house new admissions. Id.

29) "Phase-II" consists of "double-bunking" to accommodate the increased population. The existing population, those residents current civilly committed under the pre-1990 versions of G.L. Ch.123A, will continued to be "housed separately from the new admissions. Accordingly, no resident committed under Chapter 123A would share a 'room' or 'housing unit' with new admissions." Id.

30) Defendant's have failed in their duties to institute "Phase-I," and to ensure that current residents are not "housed in the same 'unit' with new admissions."

31) Since this Court in King terminated the "Consent Decrees," defendant's have drastically also changed both the

"tier system of security" and the "privilege level system." Exhibit-4.

32) According to the "terms and conditions" of both the 96 and 99 Plan's, the DOC alleges to still follow the "existing system of differing levels of security and privileges in order that residents can be maintained in the 'least restrictive conditions necessary to achieve the purpose of commitment.'" Exhibit-1 at page 10 "E. Resident Management and Operations;" Exhibit-2 at page 6 "V. Resident Management and Operations."

33) According to current policy, Exhibit-4, supra, the least restrictive and highest privilege is denoted as a "Blue Dot," with "Yellow" being the most restrictive and least privileges. Id.

34) The plaintiff is currently denoted as a "Blue Dot."

35) The plaintiff is not housed in a "lessor restrictive conditions" at the MTC than any other resident denoted as a "yellow, green, or red dot," or for that matter, any resident having no privileges and being disruptive.

36) The current "privilege system" consists of alleged privileges that are non-existent, and if no privileges existed at all. Id.

37) The purpose of the "tier and privilege systems" is to ensure that each resident is housed in the "least restrictive conditions consistent with their security," and to "reward each resident for good behavior, and for his/her progress in treatment." Id.

38) With the recent re-enactment in G.L. Ch.123A and the increase in the population at the MTC, defendant's have made

no accommodations to expand the following areas of the MTC, along with the increase in the population: Health Services Unit 2/; Library Services 3/; Resident Dining Hall 4/; Main Yard Access 5/; Resident Gymnasium 6/; Institutional Jobs and Pay 7/; and Visits 8/.

(Claims Under the "Equal Protection Clauses"):

39) Prior to the enactment of St.1993, c.489, residents at the MTC were allowed to purchase and retain at their own expense certain personal possession, such as, but not limited to: clothing of their own choosing, bed linen of their own choosing, remote control T.V.'s (with speakers), walkman type radios, stereo systems (with external speakers), fully equipped computer systems, word processors, office supply's, lamps, electronic games, electric razors/beard trimmers, watches, etc..

40) According to the "terms and conditions" of the 96 Plan, the DOC substituted these property policies, and require residents to follow the exact same property policies that state prisoners are required to follow. Though, due to the "unique nature of the MTC, and its civilly committed population," a special policy was enacted allowing residents retention of existing property in their possessions, and additional storage space as needed. Exhibit-6 at pages 35-36 "B. Property and Furnishings."

41) According to the 99 Plan, new adult male commitments "will be treated in the same fashion as any other SDP presently residing in the facility since their pre-1990 civil commit-

ments." Exhibit-1 at pages 31-32 "Day to Life Civil Commitment."

42) The plaintiff requested upon defendant Murphy to be afforded similar privileges, at her own expense, and was denied. Exhibit-5.

43) All new civil commitments, like the plaintiff, must follow all "rules, regulations, policies, and procedures" promulgated for state prisoners."

44) There exist no difference, other than on paper, from plaintiff's current civil confinement, than those conditions designed to "punish" for prisoners serving criminal sentences at a "penal" facility.

45) The conditions of confinement at the MTC "mirror" those conditions designed to "punish" for prisoners serving criminal sentences at a "penal" facility.

**(Claims Upon the "Constitutionality of St.1993, c.489," and Defendant's Ability to Operate the MTC in "Harmony with the 'Terms and Conditions' of the 94, 96 and 99 Plan's):**

46) In January of 1994, respondent's in the King case filed a Motion to Modify the then existing Consent Decrees. In support of their motion, respondent's argued that, the terms of St.1993, c.489 directly contradict the Consent Decrees, therefore, modification was necessary due to the "significant change in law" under Rufo.

47) In April of 1995, the First Circuit Court of Appeals reversed the district court's ruling in King, holding that,

St.1993, c.489 was a "significant change in the law" under Rufo warranting modification of the Consent Decrees. Based upon this ruling, and the DOC's alleged assurance to follow the "terms and conditions" of the 96 Plan, the Consent Decrees were terminated, rather than vacated.

48) In September of 1999, the Legislature re-enacted G.L. Ch.123A, and once again provided for the day-to-life civil commitment of "sexually dangerous persons." See St.1999, c.74.

49) The plaintiff maintains that, the re-enactment of G.L. Ch.123A in St.1999, c.74, is a "significant change in the law" under Rufo warranting this Court's review of the constitutionality of St.1993, c.489, and the DOC's ability to manage and operate the MTC as a mental health facility, based upon the numerous Complaints from residents at the MTC since the implementation of the 96 Plan, and the following facts.

50) During the evidentiary hearing on the respondent's Motion requesting modification of the Consent Decrees in the King case, this Court questioned the DOC's ability to deliver effective treatment and to manage and operate the MTC in a constitutional effective manner.

51) Based upon the 96 Plan, the defendant's implementation of that Plan, and the DOC's assurance of providing effective treatment to civilly committed residents at the MTC, under the guidance of it's renowned expert, Dr. Barbara K. Schwartz, the Consent Decrees were terminated, rather than vacated.

52) The 96 Plan, as well as the 99 Plan, purports that, in July of 1992, the DOC contracted with Justice Resource In-

stitute to administer the new "Treatment and Rehabilitation Programs" at the MTC, under the guidance of Dr. Barbara K. Schwartz, the nations foremost specialist in the clinical treatment of convicted sex offenders. Exhibit-2 at pages 11-12 "A(1). The MTC's Comprehensive Sex Offender Treatment Program, Introduction;" see also Exhibit-1 at pages 13-14 "1(a). The MTC's Comprehensive Sex Offender Treatment Program, Introduction."

53) In 2001, the DOC terminated the contract with Justice Resource Institute and Dr. Barbara K. Schwartz. Shortly thereafter, the DOC contracted with Forensic Health Services, Inc., under the guidance of it's new clinical director, Dr. Nicholas Petrou, who is not even licensed in the state of Massachusetts.

54) Aside from holding the current contract to administer both the "Treatment and Rehabilitation Programs" at the MTC, forensic Health Service, Inc., also currently holds the DOC's contract to provide nearly all pre-commitment evaluations under St.1999, c.74.

55) In June of 2002, in response to Steve Remeika, a resident at the MTC's letter requesting Dr. Schwartz's professional opinion as to "whether the MTC has improved in the recent changes in the JRI program?" Dr. Schwartz, the DOC's renounced expert stated that: (1) Obviously conditions of confinement have deteriorated markedly; (2) JRI believed that it was working productively with the DOC to provide a treatment program that would lead to the release of civils; (3) I had no idea that the agenda for Corrections was to fight any program that

had the above goal; (4) JRI was ordered to continue offering the program described to the court and to maintain control of the treatment program. We have been unable to do that due to interference from the DOC who have consistently undermined the program and requested that staff engage in unethical conduct that has threatened our professional license; (5) When we have resisted efforts to maintain professional integrity, we have been openly referred to as a "f------ pain;" and (6) I loved working at the Treatment Center but feel I was "naive for testifying for the DOC." Exhibit-6.

## CAUSES OF ACTION:

### COUNT I

56) The plaintiff reasserts the allegations contained in paragraphs 1 through 55 of the Complaint, as if fully set forth herein.

57) The actions of the defendant's constituted a "breach of their duty" owed the plaintiff to run the MTC in "harmony" with the "terms and conditions" of the Management Plan.

### COUNT II

58) The plaintiff reasserts the allegations contained in paragraphs 1 through 55 of the Complaint, as if fully set forth herein.

59) The actions of the defendant's in allowing those resident's currently civilly committed under the pre-1990 versions of G.L. Ch.123A to retain certain personal luxuries in their possession, while not affording those residents, like the plaintiff, currently civilly committed under the amended

1999 version of G.L. Ch.123A the same privilege, creates a "sub-class" of civilly committed residents within the MTC, in violation of residents, like the plaintiff's rights under state and federal equal protection clauses, as well as under the "terms and conditions" of the 99 Plan.

## COUNT III

60) The plaintiff reasserts the allegations contained in paragraphs 1 through 55 of the Complaint, as if fully set forth herein.

61) The re-enactment of G.L. Ch.123A, as appearing in St.1999, c.74 is a "significant change in the law" under Rufo warranting review of the constitutionality of St.1993, c.489, and the DOC's ability to run the MTC in harmony with the "terms and conditions" of the Management Plan.

## COUNT IV

62) The plaintiff reasserts the allegations contained in paragraphs 1 through 55 of the Complaint, as if fully set forth herein.

63) The actions of the defendant's have been conscious, repeated, and have intentionally or recklessly in a negligent manner caused the plaintiff extreme emotional distress.

THE PLAINTIFF DEMANDS A TRIAL BY JURY:

WHEREFORE, the plaintiff respectfully requests that this Court grant her the following relief:

(a) a declaratory judgment that the 94, 96, and 99 Plan's are operating enforceable documents, and have the force of law;

(b) a declaratory judgment that the defendant's actions and behaviors as outlined herein constituted a "breach of duty" owed the plaintiff to run the MTC in harmony with the "terms and conditions" of the Plan's;

(c) a declaratory judgment that the current conditions of confinement at the MTC "mirror" those conditions at a "penal" facility designed to "punish;"

(d) a declaratory judgment that the defendant's actions and behaviors as outlined herein violated plaintiff's rights to equal protection under both the State and Federal Constitutions, as well as under the "terms and conditions" of the 99 Plan;

(e) a declaratory judgment that St.1999, c.74 is a "significant change in law" under <u>Rufo</u>, warranting review of the constitutionality of St.1993, c.489, and the DOC's ability to run the MTC in harmony with the "terms and conditions" of the Plan;

(f) a declaratory judgment that St.1993, c.489 is unconstitutional;

(g) a declaratory judgment that the DOC have failed to demonstrate that they can run the MTC in harmony with the "terms and conditions" of the Plan;

(h) an injunction requiring defendant's to immediately allow those residents, like the plaintiff currently civilly committed under the amended 1999 version of G.L. Ch.123A, to purchase and retain at their own expense all those personal luxuries afforded to residents currently civilly committed

under the pre-1990 versions of G.L. Ch.123A;

(i) an injunction requiring the defendant's to immediately expand all areas of the MTC to accommodate the increase in resident population;

(j) an injunction requiring defendant's to immediately amend the MTC's current system's of "differing levels of security and privileges" to ensure the plaintiff, and residents alike, are housed at the MTC in the "least restrictive conditions necessary to achieve the purpose of commitment," according to their individual levels of security, and are afforded adequate privileges consistent with their individual levels of security(privileges should be consistent with the "unique nature of the facility and civil population");

(k) an injunction requiring defendant's to immediately re-open the MTC's "community access program," and ensure that resident's are afforded actual access to the community;

(l) an injunction enjoining the defendant's from having "full custody and control" over the MTC and civil population;

(m) an injunction entering a "Consent Decree" between the parties over the administration and operation of the MTC;

(n) an award of compensatory and punitive damages;

(o) an award of damages for causing the plaintiff's extreme emotional distress;

(p) an award of attorney fees incurred in this litigation;

(q) award plaintiff her costs and interest incurred in this litigation; and

(r) such other and further relief as this court deems

-19-

just in the proper.

Dated: 2/1/04.                    Respectfully submitted,

                                  [signature]
                                  Sandy J. Battista, #M-15930
                                  Plaintiff/Pro-se
                                  Mass. Treatment Center
                                  30 Administration Rd.
                                  Bridgewater, Mass. 02324


**CERTIFICATE OF VERIFICATION**

I, Sandy J. Battista, hereby verify's that all of the information and facts contained herein are true and accurate to the best of my personal knowledge and belief, and my records show them to be true and accurate. Except as to those matters alleges upon information and belief, and as to those matters, I believe them to be true and accurate.


Dated: 2/1/04.                    [signature]
                                  Sandy J. Battista, #M-15930
                                  Plaintiff/Pro-se

---

Footnotes:

[1] Due to a recent escape, defendant's have completely closed down the "transition and community access program" at the MTC. This alone not only question the DOC's ability to effectively run the MTC, but questions the constitutionality of the MTC it self. See Guidelines for Civil Commitment Facilities by the National Association for the Treatment of Sexual Abusers ("NATSA"), Civil Commitment of Sexually Violent Offenders: 4. Transition to the Community at http://www.atsa.com/ppcivilcommit.html.

[2] All resident rooms that were originally designed to temporarily house residents who were sick have been converted to offices for medical staff. As such, residents are now transferred to MCI-Shirley Super Max if over-night medical attention is needed. Additionally, residents are placed in a room no bigger than an average room on a housing unit to await daily medical appointments, locked in a cage, which is over-crowded at times, and charged a $3.00 medical "co-payment" each medical consultation to help reimburse for their commitment.

[3] The "General and Law Library" is confined to one small room that was originally designed to seat only 22 residents. Not one

Footnotes Continued:

extra chair has been added to the library to accommodate the increase in population at the MTC. Additionally, the MTC's "Print Shop" is directly adjoined to the library. Resident's must put up with strong chemical smells from the print shop while utilizing the library.

[4] The resident dining hall was only originally equipped to feed 216 residents. With the increase in population, residents are ordered and forced to eat there meals in 10 minutes, and be subjected to over-crowding while eating. Additionally, meals take longer to feed the population at large, which in turn prevents scheduled movements to be delayed.

[5] Due to the defendant's housing approximately 300 state prisoner's in the MTC's modular unit, their is a "split" movement to all areas of the facility. Residents are no longer provided access to the main yard twice a day, or for that matter, to any area of the facility.

[6] Id.

[7] With the increase in population at the MTC, defendant's have not made one extra institutional job. To the contrary, as recent as January of 2004, defendant's have arbitrarily cut resident's current daily pay rates to accommodate additional jobs, due to a lack of funding.

[8] See footnote 5/ above.